UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
KENNETH J. WARD, JR.,

                Plaintiff,

    -against-

NASSAU COUNTY UNIVERSITY
MEDICAL CENTER, DR. AGARIN,
CHUJUN YUAN, M.D., MICHAEL
THEODORE, Nassau County Detective,
TROISE, Nassau Police Sargent,
SALVATORE, Nassau Police Officer # 3328,
NASSAU POLICE OFFICER # 3027,

                Defendants.
-------------------------------------------------------x

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 3 0 2019 ★

BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
15-CV-05316 (CBA) (ST)

**AMON, United States District Judge:**

    Plaintiff Kenneth J. Ward, Jr., proceeding pro se, brought this case asserting claims under

42 U.S.C. § 1983 and New York State law arising out of his involuntary commitment at Nassau

University Medical Center for six days in July 2015. (D.E. # 6 ("Am. Compl.").) Ward moves

for summary judgment. (D.E. # 86 ("Pl. Mem.").) Two sets of defendants move separately for

summary judgment: Defendants Detective Michael Theodore, Lieutenant Valerie Troise, Police

Officer Joseph Salvatore, and Nassau Police Officer # 3027 (collectively, "County Defendants"),

and Maria-Victoria Agarin, Chujun Yuan, and Nassau University Medical Center (collectively,

"NUMC Defendants"). (D.E. # 103 ("County Defs. Mem."), D.E. # 110 ("NUMC Defs. Mem.").)

For the reasons stated below, Ward's motion is denied and the County Defendants' and NUMC

Defendants' motions are granted in part and denied in part.

**BACKGROUND**

    On July 16, 2015, Ward visited the Department of Veteran Affairs (the "VA") in

Hicksville, New York, for an appointment with Jeanne Morrison, a supervisor, to discuss the

1

unauthorized release of his military records. (Pl. Mem. ¶ 3(a); D.E. # 6 ("Am Compl.") ¶¶ 1, 4, 24, 55–57.) In a supporting deposition prepared for the Nassau County Police Department, Morrison recounted that she brought Ward into her office and attempted to assist him when he "started to get angry saying when his parents died he got no money and the courts cheated him." (D.E. # 101-4 ("Morrison Supp. Dep.").) Ward had a sheet of paper with photos of individuals, and he pointed to them stating, "I am going to take them out one by one." (Id.) Morrison believed the individuals depicted were the judges involved in Ward's cases. (Id.) Morrison believed Ward needed immediate medical care and called 911. (Id.) Ward said it seemed like the police were called "as soon as [he] got there" and that he never threatened anyone at the VA. (D.E. # 108-6 (Sealed Pl. Dep.) at 82:2–5, 83:6–11.)

On the 911 call, a caller from the VA reported that a client—referring to Ward—was "homicidal, he's having some mental health issues, and has been threatening that if things kind of don't go his way today he's going to start killing people." (D.E. # 101-3 (Audio 911).) When asked whether Ward had weapons, the caller said she was not sure because she was not with him at the moment, but she would "imagine that he probably has weapons at home." (Id.) She said he was "not being violent, but he is being threatening and aggressive." (Id.)

Lieutenant (then-Sergeant) Troise testified at her deposition that she and other officers responded to a 911 call to the VA for a "mental aided," which is terminology for "somebody who is not acting in the right frame of mind." (D.E. # 101-8 ("Troise Dep.") at 7:9–8:8.) Troise said that Ward told her he was "threatening to kill the judge and everybody that did not side with [him]." (Troise Dep. at 13:6–18.) Troise ultimately decided that Ward was a "threat to somebody else" and needed help, so she directed that Ward be transported to the Nassau County Medical Center (the "Medical Center") to be evaluated by a psychiatrist. (Troise Dep. at 17:6–18:9.) Ward was

transported to the Medical Center in a police ambulance without his consent and against his will. (Pl. Mem. at 3(c)–(d); D.E. # 101-5 ("Case Summary Rpt.").)

According to the Patient Care Report, provided to the Medical Center by the officers, Ward was "alert and agitated stating they are not helping him." (D.E. # 108-12 (Sealed NUMC Ex. P.).) The Patient Care Report further indicated that Ward threatened to "kill people," refused to allow personnel to take his vital signs, and was uncooperative. (Id.) According to the admission notes by a nurse at the Medical Center, although Ward was "calm upon arrival," he became "often uncooperative during the interview and nursing assessment." (D.E. # 102-1 (Sealed County Ex. H.).) He "said that if his legal issues don't go the right way, he will kill people." (Id.) Ward was "very agitated, disorganized, making harmful gestures and threatening staff." (Sealed County Ex. H.) The Psych ER Receiving Form similarly indicated that Ward was "claiming to be a military vet, won't answer questions, says if his legal issues don't go the right way, he will kill people." (D.E. # 102-2 (Sealed County Ex. I).)

Detective Michael Theodore was also dispatched to the VA, and was informed on the scene by Troise that Ward had been taken to the hospital in an ambulance. (D.E. # 101-9 ("Theodore Dep.") at 12:6–13:11.) Theodore went to the hospital and spoke with Ward. (Id. at 13:22–14:2.) According to Theodore, Ward explained that he did not intend to scare or threaten anyone and readily agreed to a search to assuage anyone's concerns that he had weapons. (Id. at 15:3–23.) According to Ward, Theodore effectively told Ward that if Ward forced the police to get a warrant for the searches instead of consenting, it would be "tougher" on Ward. (Pl. Mem. ¶ 3(h); Am. Compl. ¶ 82, 165; Pl. Dep. at 129:23–24 ("And basically, he threatened me, if I don't give him my keys, he's going to have a problem with me.").) Theodore did not recall making any statement to that effect. (Theodore Dep. at 15:24–16:14.) Ward signed two consent forms: one for his vehicle,

3

(D.E. # 101-7), and one for his home, (D.E. # 101-6).  On both forms, Ward wrote the initials

"U.D." before his signature,  (id.), which he said stands for "under duress," (Pl. Mem. ¶ 3(h).)

Ward said he used the words "under duress" "repeatedly as [he] was signing the consents," (Pl.

Mem. ¶ 3(h)), but Theodore testified that Ward "never said" the words "under duress."  (Id. at

24:21–25:2.)  No weapons were recovered after officers searched Ward's vehicle and apartment.

(Id. at 22:6–24:5, 25:19–21.)

Dr. Chujun Yuan, then a second-year psychiatry resident, performed a complete psychiatric

examination of Ward after receiving the Patient Care Report and Psych ER Receiving Form.  (D.E.

# 108-1 (Sealed Yuan Aff.) ¶ 1, 4.)  He documented that Ward was "agitated, disorganized, . . .

yelling at people and pacing in the ER hallway" and "making harmful gestures and threatening

staff." (Yuan Aff. ¶ 5.)  Ward also failed to respond to redirection and limit-setting and refused to

take oral medications.  (Id.)  Based on these observations, which in his opinion posed a danger to

other patients and personnel, Ward was given an injection of Haldol, Benadryl, and Ativan.  (Id.)

Although Dr. Yuan instructed the nursing staff to administer Risperdal, Ward refused to take the

medication and was "repeatedly admonished and publicly humiliated by the hospital nursing staff

over [his] refusal." (Pl. Mem. ¶ 3(f).)  Dr. Yuan reevaluated Ward later that evening and concluded

that he was delusional and "exhibiting poor judgment and impulse control."  (Id. ¶ 6.)  Dr. Yuan

opined that Ward was "currently psychotic and was at high risk for being homicidal and he required

immediate psychiatric admission and treatment."  (Id. ¶ 7.)

Dr. Mukesh Sharoha, the psychiatric attending physician, then examined Ward with Dr.

Yuan.  (Id. ¶ 8; D.E. # 108-2 (Sealed Sharoha Aff.) ¶ 11.)  Based on Dr. Sharoha's own examination

and evaluation, he found Ward to be "agitated, bizarre and illogical," concluded he was "suffering

from psychosis," and believed that he was "harmful to himself or others and in need of immediate

4

hospitalization." (Sharoha Aff. ¶ 11.)   Dr. Sharoha's admission plan included 15-minute observations and an order for Risperdal, an anti-psychotic medication, but in his understanding, no Risperdal was actually administered to Ward. (Id.) That day, Drs. Sharoha and Yuan completed an application for Involuntary Admission on Certificate of a Director of Community Services or Designee, Form OMH 475, pursuant to Mental Hygiene Law § 9.37. (Yuan Aff. ¶ 8, Sharoha Aff. ¶ 13, D.E. # 108-11 (Sealed NUMC Ex. O).)  As the attending psychiatrist in the emergency room, Dr. Sharoha serves as designee of the Director of Community Services. (Sharoha Aff. ¶ 5.)  Dr. Yuan also filled out and signed Form OMH 475 SR, titled "NOTICE OF STATUS AND RIGHTS INVOLUNTARY ADMISSION OF A DIRECTOR OF COMMUNITY SERVICES OR DESIGNEE," which was given to Ward. (Id. ¶ 8; Sealed NUMC Ex. O.)

On July 17, 2015, Dr. Vasmi Chiguripati, an attending psychiatrist who was covering for Dr. Agarin, completed a form titled "EXAMINATION WITHIN 24 HOURS" to confirm the need for hospitalization of a patient admitted based on the Certificate of Observation by a Director of Community Service. (Sealed NUMC Ex. O.)  Dr. Chiguripati observed that Ward was "bizarre and illogical" and concluded based on his "presentation, his delusions, paranoia and the history of threatening to kill people that Ward "presented as a threat to himself or others." (D.E. # 108-3 (Sealed Chiguripati Aff.) ¶¶ 9–10.)  Dr. Chiguripati also obtained collateral information by contacting individuals whose names and numbers were provided by Ward; one of those individuals, who had previously treated Ward, reported that he had been having psychotic outbreaks and that his ex-wife and daughter had an order of protection against Ward. (Id. ¶ 14.) Dr. Chiguripati diagnosed Ward with "Psychosis, unspecified." (Id. ¶ 10.)  Chiguripati said Ward "required further examination and evaluation" but he did not require medication at that time, so Ward remained in the psychiatric unit. (Id. ¶ 16.)

Dr. Maria-Victoria Agarin saw Ward for the first time on July 20, 2015. (D.E. # 108-4 ("Sealed Agarin Aff.") ¶ 4.) Dr. Chiguripati was covering her patients on July 17, 2015, and she was not on call during the weekend on July 18–19, 2015. (Id.) During her examination, Ward was "very guarded as to any information he provided because of his pending lawsuits" and was "obsessed and focused on discussing . . . family issues and the court case." (Id. ¶ 9.) She diagnosed Ward with "delusional disorder, paranoid type." (Id. ¶ 10.) Although her treatment plan involved Risperdal, Ward refused medication, and none was administered. (Id.) Ward also refused a CAT scan, and none was performed. (Id.) According to Ward, Dr. Agarin told him that he would not be released until he agreed to take a CAT scan, (Pl. Mem. ¶ 3(j)), but Ward does not contend that a CAT scan was actually performed. On July 21, 2015, Ward "appeared to be calm and composed, but continued to focus on his lawsuits." (Sealed Agarin Aff. ¶ 12.) His conversations "continued to carry a paranoid quality." (Id.) Ward continued to refuse oral antipsychotic medication. (Id. ¶ 13.) Based on her evaluation, Dr. Agarin ultimately concluded that Ward was not exhibiting any threatening or dangerous behavior and could be discharged without medication. (Id. ¶¶ 13–14.) She also discontinued the 15-minute monitoring. (Id. ¶ 15.) Ward was ultimately discharged on July 22, 2015 without medication because Dr. Agarin concluded he "no longer presented as a harm to himself or the community." (Id. ¶ 16.)[1]

Finally, the NUMC Defendants retained an expert, Dr. Phillip Muskin, who reviewed deposition testimony, Ward's medical records, the Patient Care Report, Morrison's statement to Nassau County Police, and copies of Ward's consent forms. (D.E. # 108-5 (Sealed Muskin Rpt.) at ECF p. 51.) Based on his review and his experience, training and expertise in psychiatry, Dr.

---

[1] Ward repeatedly cites to an audio tape of Dr. Agarin's deposition. (See Pl. Mem. ¶ 3(j), (l), (n).) But Ward did not provide a copy of this audio tape to the Court, and the NUMC Defendants were apparently unable to locate a copy. (NUMC Defs. Opp'n at 1–2.)

Muskin stated, "[I]t is my opinion within a reasonable degree of medical certainty that the care and treatment rendered to Kenneth Ward at Nassau University Medical Center during the initial Emergency Room Evaluation on July 16, 2015 and the subsequent admission through July 22, 2015 was at all times appropriate, medically indicated, and . . . within the standards of good and accepted medical practice." (Id.) Dr. Muskin further opined based on his review that Ward "was in need of immediate hospitalization for the psychosis he exhibited." (Id. at ECF p. 53–54.)

Ward filed suit on September 2, 2015 and requested leave to proceed in forma pauperis. (D.E. # 1, D.E. # 2.) He filed an Amended Complaint on March 7, 2016. (Am. Compl.) On May 18, 2016, this Court granted Ward's motion for leave to proceed in forma pauperis, but dismissed his claims against the following defendants for failure to state a claim: New York State, the Veterans Administration, the National Archives, the New York State Department of Mental Health, Jeanne Morrison, Kevin Pratt, Nassau County, Nassau Police Officer 2330, Nassau Police Doe 1–7, and Doe 1–9. (D.E. # 7 ("IFP M&O").)

Following discovery, the Court approved a briefing schedule for the parties' cross motions for summary judgment, with motions due on January 25, 2019, oppositions due on March 8, 2019, and replies due on April 5, 2019. (D.E. # 81.) Fully-briefed motions were to be filed with the Court by April 5, 2019. (Id.) Ward did not file any opposition to Defendants' motions or any reply to Defendants' oppositions to his motion. The County Defendants and the NUMC Defendants both requested that their motions be deemed unopposed and fully briefed. (D.E. # 105, D.E. # 112.) On April 7, 2019, Ward requested a 45-day extension to file his replies to Defendants' oppositions, explaining that he did not receive Defendants' papers until April 5, 2019 and could not access sealed D.E. # 92 through 96. (D.E. # 113.) Both the County Defendants and the NUMC Defendants opposed Ward's request as disingenuous, because (1) the Defendants' moving papers

7

were timely served on March 8, 2019, (2) Ward is on the ECF notification list, (3) the sealed documents were related to Ward's request to file information related to his medical treatment under seal, and (4) each sealed document was previously served on Ward. (D.E. # 115, D.E. # 116.) Over Defendants' objections, the Court granted Ward's request for an extension and indicated that no further extensions would be granted. (D.E. # 117.) Ward did not request an extension of time to file any opposition to Defendants' motions. To date, Ward has not filed any reply to Defendants' oppositions or any opposition to Defendants' motions for summary judgment.

## STANDARD OF REVIEW

A court grants summary judgment under Rule 56 only when, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in [his] favor," Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108 (2d Cir. 2013), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," id. (quoting Fed. R. Civ. P. 56(a)). "[N]onmoving parties 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and they 'may not rely on conclusory allegations or unsubstantiated speculation.'" Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (citations omitted). Where, as here, the parties have cross-moved for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co., 762 F.3d 165, 174 (2d Cir. 2014) (quoting Morales v. Quintel Entertainment, Inc., 349 F.3d 115, 121 (2d Cir. 2001)).

Because Ward appears pro se, the Court construes his submissions liberally to raise the strongest arguments they suggest, Warren v. Colvin, 744 F.3d 841, 843 (2d Cir. 2014), and "examines every claim or defense with a view to determining whether summary judgment is

8

legally and factually appropriate," Jackson v. Fed. Exp., 766 F.3d 189, 198 (2d Cir. 2014). "Nonetheless, '[p]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence, are insufficient to overcome a motion for summary judgment.'" Angulo v. Nassau Cty., 89 F. Supp. 3d 541, 549 (E.D.N.Y. 2015) (alteration in original) (quoting Rodriguez v. Hahn, 209 F. Supp. 2d 344, 348 (S.D.N.Y. 2002)).

In addition, when a pro se litigant has not moved for summary judgment, the Court must be satisfied based on "all of the circumstances, including the papers filed by the pro se litigant, . . . that the litigant understood the nature of the adversary's summary judgment motion and the consequences of not properly opposing it." Sawyer v. Am. Fed'n of Gov't Employees, AFL-CIO, 180 F.3d 31, 35 (2d Cir. 1999). In general, a pro se litigant has been afforded adequate notice "where an opposing party has already provided the litigant with the requisite notice, or where the record otherwise makes clear that the litigant understood the nature and consequences of summary judgment." Vital v. Interfaith Med. Ctr., 168 F.3d 615, 621 (2d Cir. 1999) (citations omitted).

## DISCUSSION

As an initial matter, the Court is satisfied that Ward understood the nature and consequences of summary judgment. The County Defendants served Ward with a copy of their motion, along with a "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment." (D.E. # 84, 100, 100-1.) The NUMC Defendants served Ward with a copy of their motion, along with a "Notice to Pro Se Litigant Who Opposes a Motion for Summary Judgment." (D.E. # 85, 106, 106-1.) Both Notices informed Ward that Defendants had moved for summary judgment, afforded him the opportunity to submit affidavits or documentary evidence, and described the nature and consequences of summary judgment. (D.E. # 106-1, 100-1.) In addition, Ward

previously filed a registration and consent to receive electronic filings via the Court's ECF system. (D.E. # 41.) Despite being served with the Defendants' motions by mail, (D.E # 106-1, 100-1), and receiving electronic notifications confirming service on January 25, 2019, (D.E. # 84, 85), Ward did not file any opposition to Defendants' motions. Nor did he request an extension of time or otherwise respond to Defendants' requests that their motions be deemed unopposed and fully briefed. (D.E. # 105, 112.) Nonetheless, the Court will consider the evidence Ward submitted in connection with his own motion in evaluating Defendants' motions. (D.E. # 86.)

As for Ward's motion, Defendants served their oppositions by mail and Ward received electronic notifications confirming service on March 8, 2019. (D.E. # 89, 90.) On April 7, 2019, Ward requested a 45-day extension to file his replies to Defendants' oppositions and raised his inability to access sealed D.E. # 92 through 96. (D.E. # 113.) As Defendants explained in their opposition letters, (D.E. # 114, 115), all of these documents are related to Judge Tiscione's order granting Ward's request to seal documents referencing his private medical information, (see D.E. # 83, D.E. dated December 20, 2018). D.E. # 92 is this Court's order granting the NUMC Defendants' motions to file certain documents under seal, (D.E. # 91), and D.E. # 93 is the County Defendants' motion to file certain documents under seal, which was later granted, (D.E. # 116). D.E. # 94, D.E. # 95, and D.E. # 96 are Defendants' oppositions to Ward's motion for summary judgment, which were previously served upon him. (D.E. # 89, 90, 114, 115.) The Court granted Ward's request for an extension of time over Defendants' objections. (D.E. # 117.) Even assuming Ward was not aware of the nature of the sealed documents before the original deadline for his reply, he was made subsequently made aware that he had already received the sealed documents, (D.E. # 114, 115), and granted an extension to prepare his reply, (D.E. # 117). Ward failed to file any reply by the extended deadline.

10

In sum, Ward was properly served with Defendants' motions and informed of his obligations to respond; he was also properly served with Defendants' oppositions to his motion and afforded an extension to file his reply, which he failed to do. Although pro se plaintiffs are granted special leniency in procedural matters, LeSane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 209 (2d Cir. 2001), that latitude is not unlimited. Under all the circumstances, the Court is satisfied Ward "understood the nature of the adversary's summary judgment motion and the consequences of not properly opposing it." Sawyer, 180 F.3d at 35.

## I.    Background on New York Mental Hygiene Law

Ward's claims center around the proper application of New York's Mental Hygiene Law. There are two relevant provisions governing involuntary admission: admission upon medical certification, MHL § 9.27, and admission on certificate of a director of community services or his designee, MHL § 9.37.

Under MHL § 9.37, the Director of Community Services or his designee may involuntarily admit as a patient "any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others." MHL § 9.37(a). "The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission." Id. The patient must be personally examined by the Director or his designee. MHL § 9.37(b). "Such patient may not be involuntarily retained beyond seventy-two hours unless an additional staff physician certifies the need for retention." Project Release v. Prevost, 722 F.2d 960, 967 (2d Cir. 1983) (citing MHL § 9.37(a)).

Under MHL § 9.27, a person "alleged to be mentally ill and in need of involuntary care and treatment" may be admitted "upon the certificates of two examining physicians, accompanied

by an application for the admission" by one of several designated classes of individuals. MHL § 9.27(a). In addition, a "person may not be involuntarily admitted unless a third (staff) physician also certifies, after examination, that such person is in need of involuntary care and treatment." Project Release, 722 F.2d at 967 (quoting MHL § 9.27(e)).

The MHL also contains a provision describing the authority of police officers in emergency admissions. Under MHL § 9.41, an officer "may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others" by removing him to a specified hospital or comprehensive psychiatric emergency program. MHL § 9.41.

The Second Circuit has held that New York's Mental Hygiene Law provisions governing involuntary commitment "meet the minimum facial requirements of due process—both substantive and procedural." Project Release, 722 F.2d at 971.

## II.     Ward's Federal Claims

Ward asserts claims pursuant to 42 U.S.C. § 1983 for violation of his constitutional rights under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments as well as Article 9 of the New York State Mental Health Law. (Pl. Mem. ¶ 3(n)–(o); Am. Compl. ¶¶ 133–223.) Construed liberally, the Court understands Ward to challenge the constitutionality of the following events: (1) his initial seizure and transport from the VA to the Medical Center, (2) his involuntary hospitalization, (3) the unlawful search of his vehicle and apartment, and (4) various aspects of the treatment he received at the Medical Center.

### A. Seizure and Transport

Under the Fourth Amendment, a "warrantless seizure for the purpose of involuntary hospitalization 'may be made only upon probable cause, that is, only if there are reasonable

12

grounds for believing that the person seized' is dangerous to herself or to others." Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003) (quoting Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)). "The Fourth Amendment requires a 'probability or substantial chance of dangerous behavior, not an actual showing of such behavior.'" Fisk v. Letterman, 501 F. Supp. 2d 505, 526 (S.D.N.Y. 2007) (citation omitted).

In this case, the undisputed evidence establishes that the County Defendants had probable cause to believe that Ward was a danger to himself or others. Troise and her fellow officers responded to a 911 call in which a caller from the VA reported that Ward was "homicidal, he's having some mental health issues, and has been threatening that if things kind of don't go his way today he's going to start killing people." (Audio 911.) The caller further reported that Ward was "being threatening and aggressive." (Audio 911.) Further, Troise testified that Ward told her that he was "threatening to kill the judge and everybody that did not side with [him]." (Troise Dep. at 13:6–18.) Although Ward disputes that he made any threats or that there was any basis to call the police, (Sealed Pl. Dep. at 82:2–5, 83:6–11), he does not dispute that the police responded to a 911 call portraying a different—and more alarming—version of events. An officer is not required to "explore and eliminate every theoretically plausible claim of innocence before making an arrest" and may credit one individual's version of events over another's. Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997).

In any event, the individual officers would be entitled to qualified immunity. "The defense of qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Kerman v. City of New York, 374 F.3d 93, 108 (2d Cir. 2004) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

"A right is sufficiently clearly established if 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 202 (2001)). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). In this case, the officers did not violate Ward's clearly established constitutional rights when they seized him based on a 911 call reporting that Ward was threatening, aggressive, and had made death threats. Finally, the Court notes that there is no allegation that any of the NUMC Defendants were involved in Ward's initial seizure and transport to the Medical Center.

Accordingly, Defendants' motions for summary judgment dismissing Ward's Fourth Amendment claim based on his seizure and transport are granted. Ward's motion on the same claim is denied.

### B. Involuntary Hospitalization

The cognizable constitutional claims arising out of Ward's involuntary hospitalization fall into two categories: the Fourth Amendment and the Fourteenth Amendment's Due Process Clause. See Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993) (holding that "the Fourth Amendment applies to involuntary commitment"); Rodriguez v. City of New York, 72 F.3d 1051, 1061 (2d Cir. 1995) (holding that "involuntary civil commitment is a 'massive curtailment of liberty,' and it therefore cannot permissibly be accomplished without due process of law" (quoting Vitek v. Jones, 445 U.S. 480, 491 (1980))).

Under the Fourth Amendment, as articulated above, "[a] warrantless seizure for the purpose of involuntary hospitalization may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is dangerous to herself or to others.'" Anthony, 339 F.3d at 137 (internal quotation marks omitted). When Ward was transported to the

14

Medical Center, the Patient Care Report and the Psych ER Receiving Form both contained information that Ward was threatening to kill people. (Sealed NUMC Ex. P, Ex. H, Ex. I.) The admitting nurse's notes reflect the same information. (Sealed NUMC Ex. H.) And three physicians independently concluded, based on their examinations, that Ward posed a danger to himself or others. (See Yuan Aff. ¶¶ 5–7, Sharoha Aff. ¶ 11, Chiguripati Aff. ¶¶ 9–10.) Under these circumstances, no reasonable jury could fail to conclude that Ward presented a "probability or substantial chance of dangerous behavior" justifying his confinement. Fisk v. Letterman, 501 F. Supp. 2d at 526 (citation omitted).

Under the Fourteenth Amendment, the state—whether acting "pursuant to a parens patriae interest in promoting the welfare of the mentally ill, or pursuant to its police power interest in preventing violence and maintaining order"—"may not curtail or deny Fourteenth Amendment substantive or procedural due process protections" when deciding to involuntarily commit an individual. Project Release, 722 F.2d at 971. "As a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger either to herself or to others." Rodriguez, 72 F.3d at 1061; see also O'Connor v. Donaldson, 422 U.S. 563, 576 (1975) (holding that "a State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends"). And "as a procedural matter, due process does not permit continuation of a challenged involuntary civil commitment without a hearing, at which the substantive predicates must be established by clear and convincing evidence." Rodriguez, 72 F.3d at 1061.

Due process requires physicians to exercise judgment based on criteria "not substantially below the standards generally accepted in the medical community." Id. at 1063. But due process does not require physicians to be "omniscient," id., and it "must be evaluated under a standard that

15

allows physicians to operate effectively to protect the interests of the individuals about whom they make such judgments and of the public," Olivier v. Robert L. Yeager Mental Health Ctr, 398 F.3d 183, 189 (2d Cir. 2005). In other words, the MHL "implicitly defers to medical judgment, and requires physicians 'to make a medical decision, guided by standards that are generally accepted within the medical community.'" Fisk, 501 F. Supp. 2d at 522 (quoting Rodriguez, 72 F.3d at 1063). At the same time, "the question of what the generally accepted standards were is a question of fact," Olivier, 398 F.3d at 190, and "to demonstrate an objective violation of those standards, . . . a plaintiff ordinarily must introduce expert testimony to establish the relevant medical standards that were allegedly violated," Id. at 183.

As to substantive due process, the undisputed evidence establishes that multiple physicians concluded that Ward required hospitalization because he was a danger to himself or others, and their conclusions comported with applicable medical standards. Dr. Yuan, a resident, and Dr. Sharoha, an attending, both examined Ward on July 16, 2015, the day he was brought to the Medical Center. (Yuan Aff. ¶ 4; Sharoha Aff. ¶¶ 1, 11.) Dr. Yuan concluded Ward was "currently psychotic and was at high risk for being homicidal and he required immediate psychiatric admission and treatment," (Yuan Aff. ¶ 7), and Dr. Sharoha similarly concluded that Ward was "suffering from psychosis," "harmful to himself or others and in need of immediate hospitalization," (Sharoha Aff. ¶ 11). The following day, Dr. Chiguripati evaluated Ward and concluded based on Ward's "presentation, his delusions, paranoia and the history of threatening to kill people" that Ward "presented as a threat to himself or others" and "required further examination and evaluation." (Chiguripati Aff. ¶¶ 9–10, 16.) After the weekend, Dr. Agarin examined and evaluated Ward on July 20, 2015, diagnosing him with "delusional disorder, paranoid type." (Agarin Aff. ¶ 10.) Dr. Agarin examined Ward again on July 21, 2015. (Id. ¶

16

11.) Although he "continued to carry a paranoid quality," it appeared that Ward's threatening behavior had subsided, so she discontinued the 15-minute monitoring. (Id. ¶¶ 11, 14–15.) Ward was discharged on July 22, 2015 without additional medication because Dr. Agarin concluded he "no longer presented as a harm to himself or the community." (Id. ¶ 16.) Finally, the NUMC Defendants' expert opined, after reviewing Ward's medical records, that Ward required immediate hospitalization and that the treatment he received was "at all times appropriate, medically indicated, and . . . within the standards of good and accepted medical practice." (Muskin Rpt. at ECF pp. 51, 53–54.) Ward has not come forward with any evidence raising a genuine dispute as to whether the treatment decisions made by Dr. Yuan and Dr. Agarin fell outside the bounds of generally accepted medical practice. Although he argues that Dr. Agarin confined him for longer than necessary, substantive due process does not dictate a particular point at which a patient deemed a danger to himself or others must be released; in this case, there is no genuine dispute that Dr. Agarin's decision to discharge Ward when he "no longer presented as a harm to himself or the community," (Agarin Aff. ¶ 16), fell within generally accepted standards. The absence of any contrary evidence also compels the denial of Ward's motion. See Olivier, 398 F.3d at 191 (reversing jury verdict in favor of plaintiff because, absent expert testimony on "standards generally accepted in the medical community," there was no legally sufficient evidentiary basis for a jury to find that involuntary commitment violated his due process rights).

As to procedural due process, the undisputed evidence establishes that defendants complied with the MHL's relevant provisions on involuntary commitment. On July 16, 2015, police officers responded to a 911 call indicating that Ward was "homicidal, he's having some mental health issues, and has been threatening that if things kind of don't go his way today he's going to start killing people," (Audio 911), and as authorized by MHL § 9.41, Troise directed that Ward be

17

transported to the Medical Center. At the hospital, pursuant to MHL § 9.37, the designee of the Director of Community Services, Dr. Sharoha, and a staff physician, Dr. Yuan, determined that Ward should be involuntarily admitted. (See Yuan Aff. ¶ 8, Sharoha Aff. ¶ 13, Sealed NUMC Ex. O.) And well within 72 hours, Dr. Chiguripati also certified the need for involuntary admission. (Chiguripati Aff. ¶ 16; Sealed NUMC Ex. O.) Finally, although Ward argues that Dr. Agarin confined him for longer than necessary, MHL § 9.37 does not specify a timeline by which an involuntarily admitted patient must be released. Cf. MHL § 9.39 (in provision governing emergency admission for a patient alleged to have a mental illness, "[w]ithin fifteen days of arrival at the hospital, if a determination is made that the person is not in need of involuntary care and treatment, he shall be discharged unless he agrees to remain as a voluntary or informal patient").

Ward contends that his involuntary admission did not comply with MHL § 9.27, which requires the certificates of two physicians and confirmation of the need for hospitalization by a third, independent physician. (Pl. Mem. at 9.) Although it may be true that Ward's involuntary admission did not comply with MHL § 9.27, the MHL provides for multiple and distinct avenues for involuntary commitment. See Montgomery v. Cuomo, 291 F. Supp. 3d 303, 317 (W.D.N.Y. 2018) (noting that "persons may become involuntarily committed under various sections of the Mental Hygiene Law, including § 9.27, § 9.37 and § 9.39"); Meadows v. City of New York, No. 10-CV-286 (JG) (LB), 2011 WL 864832, at *5 (E.D.N.Y. Mar. 11, 2011) (summarizing different requirements of "various provisions . . . providing for involuntary commitment," including MHL §§ 9.39, 9.27, and 9.37). In any event, the Medical Center admitted Ward under MHL § 9.37— not MHL § 9.27. There is no basis for concluding that Ward's admission had to satisfy the requirements of both provisions; indeed, such a conclusion would undercut the MHL's statutory scheme, which delineates distinct avenues of involuntary commitment suited to different

18

circumstances. Ward also argues that Dr. Yuan's lack of experience stripped Dr. Yuan of the "legal authority" to certify Ward's admission, (Pl. Mem. at 9), but offers no legal basis for such a statement. Dr. Yuan was employed as a psychiatry resident at the Medical Center, (Yuan Aff. ¶ 1), and was by definition a "staff physician of the hospital" within the meaning of MHL § 9.37(a).

And again, in any event, the individual defendants would be entitled to qualified immunity. The officers and physicians did not violate Ward's clearly established constitutional rights when they involuntarily admitted him, in compliance with the provisions of the MHL, because they determined him to be a danger to himself or others. Indeed, as noted above, the Second Circuit has held that the MHL's provisions on involuntary commitment "meet the minimum facial requirements of due process—both substantive and procedural." Project Release, 722 F.2d at 971.

Accordingly, Defendants' motions for summary judgment dismissing Ward's Fourth and Fourteenth Amendment due process claims based on his involuntary hospitalization are granted. Ward's motion on the same claim is denied.

### C. Unlawful Search

A warrantless search is "'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions,'" one of which is "a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Id. at 227. Courts assess consent by a standard of "'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" United States v. O'Brien, 926 F.3d 57, 76–77 (2d Cir. 2019) (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). "Thus, 'the ultimate question presented is

19

whether the officer had a reasonable basis for believing that there had been consent to the search.'"

Id. at 77 (quoting United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995)).

There is no dispute that the police lacked a warrant, Ward signed the consent forms authorizing the search of his vehicle and his apartment, and Ward wrote the initials "U.D." next to his signature on both forms. (D.E. # 101-7, D.E. # 101-6.) But the parties dispute the circumstances of Ward's alleged consent. Theodore said Ward readily agreed to a search to assuage anyone's concerns that he had weapons. (Theodore Dep. at 15:3–23 ("[Y]ou volunteered that you would do anything in your power to show that you didn't have access to weapons and you weren't going to shoot anybody. When I suggested going to check your apartment, you said, Sure, great. I don't care. You can do whatever you want.") Ward, by contrast, said Theodore threatened him by saying that if Ward failed to consent and turn over his keys, Theodore would have a "problem with [Ward]." (Pl. Dep. at 129:23–24; Pl. Mem. ¶ 3(h); Am. Compl. ¶¶ 82, 165.) Ward also said he used the words "under duress" "repeatedly as [he] was signing the consents." (Pl. Mem. ¶ 3(h); see also Pl. Dep. at 129:23–24 ("And basically, he threatened me, if I don't give him my keys, he's going to have a problem with me."), 130:20–23 ("Did you sign [the keys] out? A: Under duress, and I put UD on there. Q: At that time? A: Correct.").) Theodore testified that Ward "never said" the words "under duress" and that Theodore did not make such a threat. (Theodore Dep. at 15:24:–16:1, 24:21–25:2.)

In light of this dispute of fact, summary judgment is inappropriate for either Ward or the defendants. Viewing the facts in the light most favorable to Theodore, Ward plainly consented to the search and in fact encouraged it—circumstances that gave Theodore "a reasonable basis for believing that there had been consent to the search." O'Brien, 926 F.3d at 77 (quoting Garcia, 56 F.3d at 423). But viewing the facts in the light most favorable to Ward, he repeated the words

"under duress" while signing the consent forms and he wrote the initials "U.D." to memorialize his lack of consent.    Moreover, he was apparently threatened with a "problem" if he refused to consent, in circumstances that rendered him particularly vulnerable to coercion, as he was in a hospital attempting to avoid involuntary admission.

Theodore contends that he was not personally involved in the search, as required to hold an officer liable under § 1983, because he did not actually conduct the search.  To hold a defendant liable, "a plaintiff must show by a preponderance of the evidence that the defendant was personally involved—that is, he directly participated—in the alleged constitutional deprivations." Gronowski v. Spencer, 424 F.3d 285, 293 (2d Cir. 2005).  Direct participation is established by "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."  Id. (quoting Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001)).   In this case, there is sufficient evidence to show that Theodore was personally involved in the unlawful search: viewing the facts in the light most favorable to Ward, Theodore intentionally participated in an unlawful search by relying on consent he knew was invalid to secure the keys necessary for that search.  Nor would Theodore be entitled to qualified immunity: on Ward's version of the facts, any reasonable officer would have known that Ward's consent was the product of duress rather than voluntary.  And it has long been clearly established that "the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." Schneckloth, 412 U.S. at 228.

Accordingly, both parties' motions for summary judgment on Ward's Fourth Amendment claim based on the unlawful search of his vehicle and apartment are denied.

### D. Treatment at Medical Center

Ward appears to challenge the Medical Center's attempts to administer him various medications, including the anti-psychotic medication Risperdal. He also takes issue with Dr. Agarin's statement that Ward would not be released until he submitted to a CAT scan. (Pl. Mem. 3(g), (j).) But as Ward himself admits, he refused these additional medications and the CAT scan, (id.), and he was ultimately released without further medication and without the CAT scan, (Agarin Aff. ¶¶ 10, 13–14). Absent evidence that Ward was in fact compelled to submit to these unwanted medical treatments, there is no basis for any constitutional claim. Similarly, although Ward points out that he was vocally admonished, embarrassed, and humiliated by nursing staff when he refused to take medications, (Pl. Mem. 3(f)), there is no basis for any constitutional claim.

Ward argues that the hospital "forced an injection of an unknown substance" into his body without his consent and in violation of his religion. (Pl. Mem. 3(e); Am. Compl. ¶¶ 11, 136, 138.) Based on the physicians' affidavits, Ward appears to have been administered Haldol, Benadryl, and Ativan. (Yuan Aff. ¶ 5.) To state a § 1983 claim alleging that his First Amendment free exercise rights were infringed, Ward "must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." Salahuddin v. Goord, 467 F.3d 263, 274–75 (2d Cir. 2006); see also Skoros v. City of New York, 437 F.3d 1, 39 (2d Cir. 2006) (holding that "a Free Exercise claim will be sustained only if the 'government has placed a substantial burden on the observation of a central religious belief,' without 'a compelling governmental interest justif[ying] the burden'" (citation omitted)). Ward has not proffered any explanation or evidence as to what religious belief was burdened by the injection, let alone how that belief was "substantially burdened." On this record, Ward has no valid First Amendment Claim. As a matter of substantive due process, although a patient may have a liberty interest in refusing unwanted

injections of medicine, that interest "is not absolute, and may be outweighed by competing state interests." Fisk, 501 F. Supp. 2d at 524 (quoting Graves v. MidHudson, No. 04-cv-3957, 2006 WL 3103293, at *3–4 (E.D.N.Y. Nov.2, 2006)). Thus, "a doctor will not be liable under § 1983 for the treatment decisions she makes unless such decisions are 'such a substantial departure from accepted judgment, practice, or standards as to demonstrate that [she] actually did not base the decision on such a judgment.'" Kulak v. City of New York, 88 F.3d 63, 75 (2d Cir. 1996) (quoting Youngberg v. Romeo, 457 U.S. 307, 323 (1982)). "This standard requires more than simple negligence on the part of the doctor but less than deliberate indifference." Id. In this case, Ward was given an injection of Haldol, Benadryl, and Ativan after Dr. Yuan observed that he was "agitated, disorganized, . . . yelling at people and pacing in the ER hallway," "making harmful gestures and threatening staff," failing to respond to redirection and limit-setting, and refusing to take oral medications—behaviors that led him to conclude that Ward was "posing a danger to other patients and personnel." (Yuan Aff. ¶ 5.) Dr. Yuan explained that it was "appropriate" to medicate such a patient to "help calm him down." (Id.) Under these circumstances, no reasonable jury could conclude that Dr. Yuan's decision to medicate Ward was so substantial a departure from accepted medical standards that he "did not base the decision on such a judgment." Kulak, 88 F.3d at 75 (quoting Youngberg, 457 U.S. at 323); see also Fisk, 501 F. Supp. 2d at 525 (granting summary judgment to defendant physicians on plaintiff's claim that they administered Risperdal without her consent in violation of substantive due process where there was "no evidence . . . that the defendants' decision to medicate her against her will deviated from accepted medical standards"). And again, because "neither the Supreme Court nor the Second Circuit has defined the circumstances under which forcible medication of an involuntarily committed patient is prohibited," Graves, 2006 WL 3103293, at *6; see also, Johnson v. Myers, No. 10-CV-1964 JS

23

WDW, 2011 WL 6131003, at *5 n.6 (E.D.N.Y. Dec. 6, 2011), the individual defendants are entitled to qualified immunity.

Accordingly, Defendants' motions for summary judgment on Ward's claims based on these allegations are granted. Ward's motion on the same claims is denied.

### E. Remaining Federal Causes of Action

Finally, to the extent Ward alleges additional causes of action, they are meritless. Ward alleges that defendants failed to intervene to prevent violation of his constitutional rights. Although "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," a "failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim." Matthews v. City of New York, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). As to the sole remaining federal claim—the unlawful search—Ward has not proffered any evidence that any other officer was present when Ward's consent was secured and failed to intervene. And because none of the other challenged events involved a constitutional violation, Ward cannot state a failure to intervene claim.

Ward also alleges that defendants violated his Fifth Amendment and Sixth Amendment rights. The Sixth Amendment applies only to "criminal prosecutions." U.S. Const. amend. VI. A § 1983 action under the Fifth Amendment self-incrimination clause "may exist" where "inculpatory statements were coerced and used against the plaintiff in a criminal proceeding," Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 346 (2d Cir. 1998). There are no criminal proceedings at issue in this case.

24

Ward also appears to attempt to hold liable the Veterans Administration and New York State for his constitutional claims. (Pl .Mem. ¶¶ 3(o), (p).) Those defendants were already dismissed. (IFP M&O at 7.)

### III.    State Law Claims

In addition to his § 1983 claims, Ward alleges state law claims for assault and battery, fraud, conspiracy, medical malpractice, false imprisonment and arrest, and intentional infliction of emotional distress. (Am. Compl. ¶¶ 133–223.) He also alleges violations of rights under the New York constitution.   (Am. Compl. ¶¶ 199–205, 233–40, 215–19.)   Defendants move to dismiss Ward's state law claims on the ground that he failed to comply with New York's notice-of-claims requirement. (County Defs. Mem. at 11; NUMC Defs. Mem. at 26–29.)

Under New York General Municipal Law § 50-e(1)(a), "a notice of claim is a condition precedent to bringing personal injury actions against municipal corporations," Hardy v. New York City Health & Hosp. Corp., 164 F.3d 789, 793 (2d Cir. 1999), or "any officer, appointee or employee thereof," N.Y. Gen. Mun. Law § 50-e(1)(a).  The requirement applies to Ward's state law claims and his New York constitutional claims, which sound in tort.  See Warner v. Vill. of Goshen Police Dep't, 256 F. Supp. 2d 171, 175 (S.D.N.Y. 2003) (requirement applies "equally to state tort claims brought as pendent claims in a federal civil rights action"); Felmine v. City of New York, No. 09-CV-3768 (CBA), 2012 WL 1999863, at *7 (E.D.N.Y. June 4, 2012) ("[T]he New York Court of Appeals indicated that a notice of claim was required for state constitutional torts, and courts in this circuit have found that rule controlling." (citation omitted)).

"The notice of claim must set forth, inter alia, the nature of the claim, and must be filed within ninety days of when the claim arises." Hardy, 164 F.3d at 793.  The requirement is construed strictly by New York courts; its purpose "is to afford the municipality an adequate

opportunity to investigate the claim in a timely and efficient manner and, where appropriate, to settle claims without the expense and risks of litigation." Id. at 793–94 (citation omitted). Although certain enumerated state courts may, in their discretion, "extend the time to serve a notice of claim," N.Y. Gen. Mun. Law § 50-e(5), f(7), "district courts within the Second Circuit 'have routinely found that they lack jurisdiction to even consider such an application.'" Berry v. Vill. of Millbrook, 815 F. Supp. 2d 711, 725 (S.D.N.Y. 2011) (citation omitted). Thus, failure to comply "ordinarily requires a dismissal for failure to state a cause of action" and renders damages unavailable. Hardy, 167 F.3d at 794. The fact that a litigant is pro se does not allow him to evade this mandatory procedural requirement. See, e.g., Berry, 815 F. Supp. 2d at 724 (dismissing all state law claims for failure to file a notice of claim despite "difficulties encountered by a pro se litigant").

In this case, both the County Defendants and the NUMC Defendants argue that no notice of claim was ever served upon them, and that failure to satisfy this mandatory requirement compels dismissal of Ward's state claims. Ward failed to raise any genuine dispute as to whether he filed a notice of claim upon the County of Nassau or the Nassau University Medical Center. His Amended Complaint alleges that he "timely filed a Notice of Claim with the County of Nassau, and the New York State Attorney General's Office, setting forth the facts underlying Plaintiff's claim against Nassau County Police Department." (Am. Compl. ¶ 131.) But at this stage, where defendants have pointed to a lack of evidence of a condition precedent to his state law claims, Ward must "come forward with admissible evidence showing that there is a genuine issue for trial"; he "cannot rely on the mere allegations or denials contained in the pleadings." Guardian Life Ins. Co. v. Gilmore, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citations omitted). There is no evidence Ward actually served notices of claim upon Defendants. Further, this Court lacks

26

jurisdiction to extend Ward's time to file a notice of claim. <u>Berry</u>, 815 F. Supp. 2d at 725. And even if Ward were to apply to an appropriate state court for an extension, that request would be untimely: the relevant provision states that an extension "shall not exceed the time limited for the commencement of an action by the claimant against the public corporation," N.Y. Gen. Mun. Law. § 50-e(5), which is "one year and ninety days after the happening of the event upon which the claim is based," N.Y. Gen. Mun. Law § 50-i. In this case, the events on which Ward's claims are based transpired in July 2015; he therefore had until October 2016, at the latest, to request an extension to file a notice of claim.

Because Ward failed to timely serve a notice of claim, the County Defendants' and NUMC Defendants' motions for summary judgment dismissing all of Ward's state law claims are granted. <u>Hardy</u>, 167 F.3d at 794. Ward's motion on the same claims is denied.

## CONCLUSION

For the reasons stated above, the NUMC Defendants' motion for summary judgment is granted in its entirety, and all federal and state claims are dismissed against those defendants. The County Defendants' motion for summary judgment is granted, except as to Ward's Fourth Amendment claim against Detective Theodore alleging an unlawful search. Ward's motion is denied in its entirety.

The Clerk of Court is respectfully directed to mail a copy of this Memorandum and Order to Plaintiff at the address listed on the docket sheet.

SO ORDERED.

Dated: September 3ᴸ/2019
      Brooklyn, New York

                                 s/Carol Bagley Amon
                                 Carol Bagley Amon
                                 United States District Judge